UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CARROLLA VASSELL,                    :
                                     :
        Plaintiff                    :    No. 4:11-CV-01185
                                     :
    vs.                              :    (Complaint Filed 6/22/11)
                                     :
MICHAEL ASTRUE,                      :
COMMISSIONER OF SOCIAL               :    (Judge Munley)
SECURITY,                            :
                                     :
        Defendant                    :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Carrolla Vassell's claim for social security
disability insurance benefits.

        Vassell protectively[1] filed his application for
disability insurance benefits on May 29, 2007. Tr. 17, 88 and
130-134.[2]  The application was initially denied by the Bureau of
Disability Determination on September 12, 2007.[3] Tr. 90-94.

_____

1. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of his Answer on August 25,
2011.

3. The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
Administration.  Tr. 91.

On November 13, 2007, Vassell requested a hearing before an administrative law judge. Tr. 96.  After more than 19 months had passed, a hearing was held before an administrative law judge on June 19, 2009. Tr. 27-70.  On October 21, 2009, the administrative law judge issued a decision denying Vassell's application for disability benefits. Tr. 17-26. On November 18, 2009, Vassell filed a request for review with the Appeals Council. Tr. 13.  After 17 months had elapsed, the Appeals Council on April 18, 2011, concluded that there was no basis upon which to grant Vassell's request for review. Tr. 1-6.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Vassell then filed a complaint in this court on June 22, 2011.  Supporting and opposing briefs and statements of material facts were submitted and the appeal[4] became ripe for disposition on December 30, 2011, when Vassell elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It

---

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

is undisputed that Vassell met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 17, 19 and 135.

Vassell, who was born on April 30, 1966, withdrew from school[5] but obtained a General Equivalency Diploma (GED) in 1984. Tr. 130 and 153.  Vassell can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 148 and 166.  During his schooling, Vassell attended regular education classes. Tr. 153.  Vassell served in the United States Military from January 20, 1988, to October 31, 1995.[6] Tr. 130.

Vassell's work history covers the years 1984 to May 25, 2006, the date on which he claims he became disabled. Tr. 133, 136-142 and 149. His past relevant work was as an electrician's helper, which was described by a vocational expert as medium, skilled work as generally performed but heavy work as actually performed by Vassell. Tr. 60. Although records indicate that he was employed by the New York County District Attorney's Office as an electrician's helper, Vassell was paid by the City of New York.  Tr. 137-143 and 258. One record of the Social Security Administration indicates that Vassell's total social security

---

5. The record does not reveal in what grade or year Vassell withdrew from school.

6. The record does not disclose in which branch of the military Vassell served.  It appears that part of his military service was either in the military reserve or national guard because commencing in 1994 he was also employed by the City of New York. Tr. 138.

earnings from 1984 through 2006 were $243,497.18. Tr. 136.
However, that record excludes his earnings during the years 1995
through 2000 (as well as some of his earnings from 1994 and
2001)[7] when he was apparently covered by a New York City pension
plan and not required to pay social security taxes. Tr. 136 and
138-139. From 1994 through 2006 the record reveals that Vassell
had earnings working as an electrician's helper for the City of
New York as follows:

| | |
|------|-----------|
| 1994 | $30888.69 |
| 1995 | 29884.76 |
| 1996 | 25118.60 |
| 1997 | 36885.44 |
| 1998 | 39358.04 |
| 1999 | 37880.99 |
| 2000 | 37434.75 |
| 2001 | 49537.08 |
| 2002 | 43960.28 |
| 2003 | 41763.80 |
| 2004 | 21631.09 |
| 2005 | 39959.33 |
| 2006 | 25118.60 |

Id.  Vassell's total earnings during those years were
$459,421.45. Id.  Vassell claims that he is disabled as the
result of physical conditions, including multiple vertebral disc
herniations. He claims he suffers debilitating pain.  He has not
worked since May 25, 2006. Vassell receives long-term disability
payments through a private insurance carrier in the amount of
$1980.00 per month. Tr. 144-147.

_____

7. In 1994 Vassell's medicare earnings were $30,888.69 and his
social security earnings were $560.40. In 2001 Vassell's medicare
earnings were $49,537.08 and his social security earnings were
$18,192.47.

4

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a

whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981);

Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in
> significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating claims for disability insurance benefits.  See 20

C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process

requires the Commissioner to consider, in sequence, whether a

claimant (1) is engaging in substantial gainful activity,[8] (2)

_____

8. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation

has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

---

proceeds no further.

9. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

8

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id.</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records.  Vassell contends he became disabled on May 25, 2006, as the result of disorders of the back. Before and after that date Vassell received extensive treatment from several physicians including Mahesh D. Chhabria, M.D., a neurologist, located in Stroudsburg, Pennsylvania. Tr. 206-215 and 231-400. We will focus on the medical treatment received by Vassell after his alleged disability onset date.  The following facts[12] are either undisputed or found in the record:

(1) On May 24, 2006, Vassell visited the emergency

---

12. The majority of these facts are taken from the statements submitted by Vassell and the Commissioner. Docs. 11 and 15.

department at the Pocono Medical Center, East Stroudsburg,
Pennsylvania, after being involved in a motor vehicle accident.
Tr. 188-193.  Vassell was a passenger in a vehicle which was rear
ended. <u>Id.</u>  Vassell was examined and discharged the same day. <u>Id.</u>
The final diagnosis was "[motor vehicle accident]; muscula[r]
strain of neck." Tr. 191.

(2) On May 25, 2006, Vassell had a cervical spine x-ray
performed at Advanced Radiology Services & The Center for
Women's Well-Being, located in Tobyhanna, Pennsylvania,
because Vassell complained of painful and limited range
of motion of the cervical spine. Tr. 367. The x-rays revealed
normal vertebral body height and alignment, minimal
narrowing of C5-C6 disc space, no fracture or
subluxation(dislocation), and no prevertebral soft tissue
swelling. <u>Id.</u> The diagnostic impression by the radiologist was
essentially normal except for mild narrowing of the C5-C6 disc
space. <u>Id.</u>

(3) On May 30, 2006, Vassell had an appointment with
Dr. Chhabria at which Vassell complained of neck and low back
pain. Tr. 383-385. Vassell ambulated with an antalgic[13] gait
pattern favoring his left side; Vassell had limited range of
motion of the cervical spine in all directions with diffuse
cervical spinal tenderness and mild paraspinal tenderness and

---

13. Antalgic is defined as "counteracting or avoiding pain, as a
posture or gait assumed so as to lessen pain." Dorland's
Illustrated Medical Dictionary, 97 (32nd  Ed. 2012).

spasms;[14] Vassell had lower lumbar spinal tenderness at L3
through S1 with left lumbar paraspinal tenderness and spasm; and
he had a negative straight leg raising test bilaterally.[15] Id.
Dr. Chhabria's assessment was that Vassell suffered from a
cervical and a lumbar strain and prescribed pain medications,
ordered MRIs of the cervical and lumbar spines, and directed that
Vassell continue with chiropractic treatments. Id. Dr. Chhabria
prognosis of Vassell was guarded. Id.

      (4) On May 30, 2006, Vassell had an MRI of the cervical
spine at Pocono MRI Imaging Center, East Stroudsburg,
Pennsylvania, which revealed a "[l]eft paramedian disc herniation
C6-7, not significantly different than [a] prior study [with]
[n]o additional findings." Tr. 390.

      (5) On May 30, 2006, Vassell had an MRI of lumbar spine
at Pocono MRI Imaging Center which revealed "L4 and L5-S1
degenerative changes, not significantly different than the prior
study [with the exception that the] [u]pper facet degenerative
changes [had] progressed mildly [and there was a new finding of
a] [l]eft lateral disc herniation at L4-5 with left L4 dorsal

---

14. The paraspinal muscles are those that run next to and roughly
parallel to the spine.

15. The straight leg raise test is done to determine whether a
patient with low back pain has an underlying herniated disc.  The
patient, either lying or sitting with the knee straight, has his
or her leg lifted.  The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing
for Herniated Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed November 27, 2012).

root ganglion[16] impingement." Tr. 391.

(6) On June 26, 2006, Vassell had an appointment with Dr. Chhabria at which Vassell complained of neck pain, low back pain, leg spasms and tingling in his hands. Tr. 269 and 381-382. A physical examination revealed severe cervical, thoracic and lumbosacral paraspinal tenderness as well as sensory changes in the left and right C6-C7 distribution.[17] Id. Dr. Chhabria noted the new herniation at L4-L5 shown on the MRI of May 30, 2006. Id. Dr. Chhabria's assessment was that Vassell suffered from a severe cervical strain with a herniated cervical disc, a lumbosacral strain with a new herniated lumbar disc involving bilateral L5 radicular symptoms,[18] and a severe thoracic strain possibly secondary to a herniated thoracic disc at the T3-T4 level where Dr. Chhabria noted the maximum "point tenderness." Id. Dr. Chhabria prescribed the nonsteroidal anti-inflammatory medications Mobic and the muscle relaxant Robaxin and directed

---

16. A ganglion is a defined as a bundle or mass of nerve cells. See Dorland's Illustrated Medical Dictionary, 757 (32nd Ed. 2012).

17. Another name for the C6 and C7 distribution is the C6 and C7 dermatomes. A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatomes Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed June 27, 2012). The C6 dermatome is located on the thumb. The C7 dermatome is located on the middle finger.

18. Radicular symptoms refers to symptoms of pain radiating from and originating at a nerve root.

that Vassell continue chiropractic treatments. Dr. Chhabria
ordered bed rest for six weeks. Id.  Dr. Chhabria further stated
that Vassell "remains temporarily totally disabled" and "[h]is
prognosis is guarded at this time." Tr. 382.

(7) On June 28, 2006, Vassell had an MRI of the
thoracic spine at Pocono MRI Imaging Center which revealed a
"[n]ew small left paramedian disc herniation [at the] T7-8
[level] with [a] stable small left paramedian disc herniation [at
the] T8-9 [level]" and a "[r]ight paramedian disc bulge [at the]
T9-10 [level] unchanged with degenerative changes [at the] T10-11
[level] and T11-12 [level] unchanged." Tr. 389.

(8) On July 16, 2006, Dr. Chhabria completed a
statement of Vassell's functional ability for Vassell's private
disability insurance company. Tr. 350-351.  Dr. Chhabria
indicated that he put Vassell "on off work status" on May 30,
2006, and that his condition had not changed.  Id.  Dr. Chhabria
further stated that Vassell had "[s]evere limitations of
functional capacity: incapable of minimal ("sedentary")
activity[.]" Id.

(9) On August 7, 2006, Vassell had an appointment with
Dr. Chhabria at which Vassell complained, inter alia,  of neck
and low back pain. Tr. 268 and 379-380.  A neurological
examination revealed significant limited range of motion of the
cervical spine in all directions secondary to spasm and
tenderness. Id. There was minimal weakness noted in the left

upper and lower extremities in contrast to the right. Id.  Deep
tendon reflexes were hypoactive[19] because of guarding. Id.
Vassell had diffuse cervical, thoracic and lumbar spinal and
paraspinal tenderness. Id.  Vassell ambulated with an antalgic
gait. Id.  Dr. Chhabria's assessment was that Vassell had
herniated discs in his cervical, thoracic and lumbar spines as
well as strains in those regions. Id.  Dr. Chhabria prescribed
the medications Vicodin (a narcotic pain reliever), Mobic and
Robaxin as well as Lidoderm patches. Id.  Dr. Chhabria noted that
Vassell "remains temporarily totally disabled until seen in
follow up." Id.

      (10) On August 14, 2006, Vassell had an appointment
with Dr. Chhabria at which Vassell complained of low back pain
rated on a scale of 1 to 10 as an 8 or 9 which radiated into the
left medial aspect of his left lower extremity. Tr. 268.

      (11) On September 5, 2006, Dr. Chhabria completed a
"Pennsylvania Department of Public Welfare Employability

---

19. There are a number of possible causes of hypoactive reflexes,
including  disc herniations. "Herniated discs in the spine, may .
. . cause hypoactive reflexes. When a disc herniates, the inner
jelly solution leaks out. Since the outer core is directly next
to the spinal nerve roots, the herniation will place pressure on
the nerve. The compression of the nerve produces pain into the
arms or legs, depending on the site of the herniation. Dics
herniated in the cervical area will cause pain into the arms.
Lumbar herniated discs are associated with leg pain, referred to
as sciatica. . . Due to disruption of the nerve pathway, the deep
tendon reflexes will be absent or diminished." Deep Tendon
Reflexes that are Hypoactive, Livestrong.com, http://www.
livestrong.com/article/146425-deep-tendon-reflexes-that-are-hypoa
ctive/ (Last accessed November 27, 2102).

Assessment Form" on behalf of Vassell. Tr. 342-344. Dr. Chhabria stated that Vassell suffered from cervical, thoracic and lumbar disc herniations and a lumbosacral strain. Id.  Dr. Chhabria further indicated that Vassell was temporarily disabled, the disability began May 24, 2006 and was expected to last until October 11, 2006. Id.  He also stated that his assessment was based on his physical examination of Vassell, review of medical records, a clinical history and appropriate tests and diagnostic procedures. Id.

(12) On September 20, 2006, Vassell underwent electrodiagnostic testing (an EMG)[20] of the bilateral upper extremities. Tr. 320-321.  The testing was performed by Suman Katara, M.D. Id.  The testing revealed the following: "Mild median nerve compression neuropathy at the wrists (carpal tunnel syndrome) bilaterally with demyelinative changes as evidenced by the abnormal median sensory and mixed palmar studies" and "[m]ild chronic C6-7 radiculopathy on the left as evidence by the

---

20. "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conduction studies measure how well and how fast the nerves can send electrical signals. . . An EMG is done to: ♦ Find diseases that damage muscle tissue. These problems may include a herniated disc . . . ♦ Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord or the area of the brain that controls a muscle can cause these symptoms. The EMG does not show brain or spinal cord disease.  A nerve conduction study is done to: ♦Find damage to the peripheral nervous system, which include all the nerves that lead away from the brain and spinal cord and the smaller nerves that branch out from those nerves . . . ." Electromyogram (EMG) and Nerve Conduction Studies, WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (Last accessed November 27, 2012).

decreased recruitment and chronic denervation changes in the . . . muscles." Id.

(13) On October 1, 2006, Vassell had x-rays at the Pocono Medical Center which revealed that he suffered from scoliosis[21] (a "left convexity scoliosis of 20 degrees from the [Thoracic 1 level to the Thoracic 5 level]" and a "right convexity scoliosis of 32 degrees from the [Thoracic 11 to the Lumbar 4 level]"). Tr. 188. The x-rays further revealed that the left femoral head was a centimeter higher than the right femoral head. Id.

(14) On October 2, 2006, Vassell had an appointment with Dr. Chhabria at which Vassell complained of severe neck and low back pain and numbness in his left foot. Tr. 377-378. The physical examination revealed "significant cervical, thoracic, and lumbosacral tenderness" and "evidence of sensory loss in the left lower extremity and mild weakness in the left hamstrings." Tr. 377.  Dr. Chhabria's assessment was that Vassell suffered from a lumbosacral strain with a new herniated disc at the L4-L5 level; a left L5 radiculopathy;[22] a cervical strain with a

---

21. Scoliosis is an abnormal lateral curvature in the normal straight line of the spine. See Dorland's Illustrated Medical Dictionary, 1681 (32nd Ed. 2012).

22. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the

cervical disc herniation at the C6-C7 level and radiculopathy; and a thoracic strain with a thoracic herniated disc. Id.   Dr. Chhabria noted that Vassell remains "temporarily totally disabled." Tr. 378.  Dr. Chhabria prescribed bed rest for 6 weeks along with pain medications. Tr. 336.

(15) On October 4, 2006, Vassell had electrodiagnostic testing (an EMG) of the left lower extremity performed by Dr. Katara. Tr. 317-319. The record is incomplete as to the interpretation and results of this testing. Tr. 317.[23]

(16) On November 20, 2006, Vassell had an appointment with Dr. Chhabria at which Vassell complained of chronic, shooting pain in the left buttocks, left sided chest pain and numbness in the left foot. Tr. 375. A physical examination revealed that Vassell had as the result of pain limited range of motion of the cervical spine in all directions, mild weakness in the left deltoid muscle, diminished sensation in the left C4 through C8 distribution and the left L4 and L5 distribution (dermatomes), hypoactive deep tendon reflexes, a negative bilateral straight leg raising tests, mild cervical spinal

narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www. medicinenet.com/radiculopathy/article.htm (Last accessed November 27, 2012).  A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id.  However, "the majority of patients respond well to conservative treatment options." Id.

23. We only located in the record the first page of the EMG report dated October 4, 2006.

tenderness, bilateral paraspinal spasm in the cervical and lumbar regions, and an intact gait. Tr. 375. Dr. Chhabria's assessment was that Vassell suffered from a cervical strain, cervical disc herniations with left radiculopathy, a thoracic strain and herniated disc, a lumbosacral strain, and multiple lumbar disc herniations with radiculopathy on the left originating from the L5 level.[24] Id. Dr. Chhabria stated that Vassell "remains temporarily totally disabled until we see him in follow up in eight weeks." Tr. 376. Pain medications were prescribed. Id.

(17) Vassell received chiropractic treatment from Richard Simeone, D.C., on December 22 and 29, 2006; January 8, 12 and 19, 2007; and February 21, 2007. Tr. 195-198. At each of these appointments Dr. Simeone found that Vassell had tenderness, spasms, pain/soreness throughout the back and decreased range of motion of the lumbar and thoracic regions of the spine. Id. He also found that Vassell had myofascial trigger points with radiation to the low back region and a right rotation subluxation (dislocation) in the cervical region. Id. It was also noted at the appointment on January 12, 2007, that Vassell had "a persistent right leg deficiency about 3/4 inch." Id.

(18) On January 24, 2007, Vassell had an appointment with Dr. Chhabria at which Vassell complained of neck pain, low back pain, mid back pain, pain radiating into the left buttock

_____

24. Dr. Chhabria in the report of this appointment did state that an "EMG of the left lower extremity recently obtained showing a possible active L5-S1 radiculopathy." Tr. 375.

and burning dysesthesias[25] in the left foot, left jaw pain and
headaches. Tr. 315.  A physical examination revealed severe
tenderness along the left temporomandibular joint,[26] cervical
paraspinal tenderness and lumbosacral tenderness. Id.  Vassell
also had tenderness in the sacroiliac region. Id.   Dr.
Chhabria's assessment was that Vassell suffered from a cervical
strain with a cervical disc herniation, a left cervical
radiculopathy, a lumbosacral strain with left L5 radiculopathy
which was secondary to a herniated disc at the L4-L5 level, and
left temporomandibular joint dysfunction. Id.   Dr. Chhabria
advised Vassell to continue having chiropractic treatments and
taking pain medications. Id.  Dr. Chhabria further stated that
Vassell "remains totally temporarily disabled." Tr. 316.

        (19) Vassell had appointments with Dr. Simeone on
January 26 and February 5, 2007. Tr. 197-198. At each of these
appointments Dr. Simeone found that Vassell had tenderness,
spasms, pain/soreness throughout the back and decreased range of
motion of the lumbar and thoracic regions of the spine. Id.  He
also found that Vassell had trigger points with radiation of pain
to the upper and lower back.[27] Id.

---

25. "Dysesthesia" is defined as a "distortion of any sense,
especially of that of touch." Dorland's Illustrated Medical
Dictionary, 577 (32nd  Ed. 2012).

26. The temporomandibular joint (TMJ) is the joint of the jaw.

27. Vassell had appointments with Dr. Simeone on March 5, 14 and
26, April 6, 17 and 23, and May 4 and 23, 2007.  There were
similar objective findings by Dr. Simeone during those

(20) On February 19, 2007, Vassell had an MRI of the lumbar spine performed at Pocono MRI Imaging which revealed the following:"L4-L5 diffuse disc bulge with broad-based left foraminal and lateral disc herniations, unchanged the previous examination" and "[m]ild L5-S1 degenerative disc disease, unchanged." Tr. 309.

(21) On February 21, 2007, Dr. Chhabria completed a statement of Vassell's functional ability for Vassell's private disability insurance company. Tr. 305-307.  Dr. Chhabria indicated that Vassell had the following condition: "Marked to severe symptoms at rest, severe symptoms with any exercise. May only be able to carry out a very minimal range of activities relating to personal care (e.g. washing, bathing). Frequently unable to leave the house. May be confined to a wheelchair or bed for much of the day.  Unable to concentrate for more than 1 hour/day." Tr. 307.

(22) On March 23, 2007, Vassell had an appointment with Dr. Chhabria at which Vassell complained of chronic neck and low back pain, left temporomandibular joint pain radiating and causing left-sided headaches, and left lower extremity pain. Tr. 208-209, 266 and 303-304.  A physical examination revealed that Vassell had diffuse cervical, lumbar and left temporomandibular join tenderness to palpation; his deep tendon reflexes were hypoactive in the bilateral lower extremities; he had a mildly

---

appointments.

antalgic gait pattern; and there was no overall change in his
exam. Id.  Dr. Chhabria's assessment was that Vassell suffered
from chronic cervical strain, chronic lumbosacral strain, left
lumbar radiculopathy and left temporomandibular joint
dysfunction. Id.   Dr. Chhabria stated that Vassell "remains
temporarily totally disabled[.]" Tr. 304.

(23) On May 30, 2007, Vassell had an appointment with
Dr. Chhabria at which Vassell complained of severe low back pain,
neck pain, back stiffness and leg weakness. Tr. 206-207, 266 and
300-301. A physical examination revealed evidence of significant
lumbosacral paraspinal tenderness, cervical paraspinal
tenderness,  limited range of motion in the lumbar spine
associated with discomfort, diffuse facet tenderness throughout
the lumbar spine, weakness in the left lower extremity with
sensory loss in the left L4-L5 distribution, and diminished knee
jerks bilaterally. Id.  Dr. Chhabria advised Vassell to continue
chiropractic treatments. Id.  Dr. Chhabria stated that Vassell
"remains temporarily totally disabled[.]" Id.

(24) On June 25, 2007, Dr. Chhabria completed a
statement of Vassell's functional ability for Vassell's private
disability insurance company. Tr. 296-297.  Dr. Chhabria
indicated that he put Vassell "on off work status" on May 30,
2006, and that his condition had not changed.  Id.   Dr. Chhabria
further stated that Vassell had "[s]evere limitations of
functional capacity: incapable of minimal ("sedentary")

21

activity[.]"[28] <u>Id.</u>

(25) On July 30, 2007, Vassell had an appointment with Dr. Chhabria at which Vassell complained of burning dysesthesia in the left side of his back radiating to the buttock and down the posterior thigh to his knee. Tr. 293-294.  He also complained about dysesthesia in the arch of the left foot. <u>Id.</u>   It was noted that Vassell could not maintain a home exercise program because of worsening pain. <u>Id.</u>  A physical examination revealed diminished pinprick sensation in the left L5-S1 distribution on the right L4 distribution, diffuse spinal tenderness and paraspinal tenderness in the mid and lower lumbar region of the spine and an antalgic gait pattern favoring the left. <u>Id.</u>  Dr. Chhabria's assessment was that Vassell suffered from a chronic lumbosacral strain with a herniated lumbar disc, a thoracic strain with a herniated thoracic disc, a cervical strain with a herniated cervical disc and left lumbar radiculopathy. <u>Id.</u> Medications were prescribed and he was advised to continue having chiropractic treatment. <u>Id.</u>

(26) On September 4, 2007, Vassell was examined by Sethuraman Muthiah, M.D., on behalf of the Bureau of Disability Determination. Tr. 216-223. Dr Muthiah after conducting an interview, reviewing the medical records and performing a

---

28. Similar statements were completed by Dr. Chhabria on July 31, October 1, and December 4, 2007; March 4 and June 18, 2008; and March 24, 2009. Tr. 204-205, 249-250, 253-254,258-259 and 286-287.

physical examination stated that Vassell suffered from a left
lumbar radiculopathy, scoliosis and a cervical strain. Id.  One
of the objective findings during the physical examination of
Vassell was that Vassell had a positive bilateral straight leg
rasing test, both seated and supine. Tr. 218. Another objective
finding by Dr. Muthiah was that Vassell had an absent deep tendon
reflex of the left knee and a diminished deep tendon reflex of
the left ankle. Tr. 217. Dr. Muthiah noted that Vassell was on
the medications Vicodin, Robaxin and amitriptyline.[29] Tr. 216.
Dr. Muthiah concluded that Vassell could only stand and walk
three hours and sit 3 hours in an 8-hour workday, less than the
requirements of full-time work. Tr. 218 and 220.

(27) On September 12, 2007, Louis Tedesco, M.D.,
reviewed Vassell's medical records (but did not examine Vassell)
on behalf of the Bureau of Disability Determination and rejected
Dr. Muthiah's opinion and concluded that Vassell could engage in
a limited range of light work on a full-time basis. Tr. 224-230.

(28) On December 4, 2007, Vassell had an appointment
with Dr. Chhabria at which Vassell complained of chronic low back
and neck pain. Tr. 262-263.  A physical examination revealed no
new changes on motor and sensory exam and significant lumbosacral
paraspinal tenderness. Id.  There was decreased range of motion
of the lumbar spine associated with pain. Id.  Dr. Chhabria

_____

29. Amitriptyline is an antidepressant but it has other uses,
including for the treatment of migraine headaches and neuropathic
pain (nerve pain).

stated that Vassell was totally disabled. Id.

(29) On March 4, 2008, Vassell had an appointment with Dr. Chhabria at which Vassell complained of numbness in the left leg down to the foot. Tr. 237-239.  A physical examination revealed that Vassell had weakness in the left knee flexor and extensor as well as dorsi flexion on the left; an antalgic gait favoring the left; limited range of motion of the cervical spine in all directions; and diffuse spinal and paraspinal tenderness in the cervical, thoracic and lumbar regions. Tr. 238.  Dr. Chhabria's assessment was that Vassell suffered from cervical, thoracic and lumbar herniated discs. Id.  Dr. Chhabria stated that Vassell "remains temporarily totally disabled until seen in follow up." Id.

Vassell was seen by Dr. Chhabria on June 10, August 8, October 21, and December 22, 2008, and March 24, 2009. Tr. 111-120, 232-236 and 240. The reports of these appointments do not reveal any significant improvement in Vassell's condition. In fact the report of March 24, 2009, reveals that Vassell had severe lumbosacral and cervical paraspinal tenderness; mild thoracic tenderness; sensory loss in the L4 and L5 distribution as well as weakness in the left hamstring; and he ambulated with an antalgic gait pattern favoring the left side. Tr. 111. Dr. Chhabria noted that Vassell was temporarily totally disabled. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Vassell has not engaged

in substantial gainful work activity since May 25, 2006, the alleged disability onset date. Tr. 19.

At step two of the sequential evaluation process, the administrative law judge found that Vassell has the following severe impairments: "cervical and lumbar degenerative disc disease with musculoskeletal pain[.]" Id. The administrative law judge did not address whether or not Vassell suffered from the following impairments: scoliosis and degenerative disc disease of the thoracic spine.

At step three of the sequential evaluation process the administrative law judge found that Vassell's impairments did not individually or in combination meet or equal a listed impairment. Tr. 20.  As part of the step three analysis the administrative law judge found that Vassell did not have "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and a positive straight leg raising test (sitting and supine)." Id.

At step four of the sequential evaluation process the administrative law judge found that Vassell could not perform his prior relevant work but that he had the residual functional capacity ("RFC") to perform a limited range of sedentary work. Tr. 20-21 The ALJ's statement of Vassell's residual functional capacity is extremely convoluted. There is a basic principle in setting a residual functional capacity, i.e., it is the most that

25

an individual can do.  In setting the RFC the ALJ, however, makes

our job difficult because of his imprecision.  For example, he

indicates that Vassell can stand somewhere between 4 and 6 hours.

The ALJ's convoluted RFC assessment states in toto as follows:

> After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual
> functional capacity to perform sedentary work as
> defined in 20 CFR 404/1567(a). The claimant has the
> capacity to perform a range of sedentary work out of
> the considerations of standing and walking limitations
> beneath the four hour threshold, and lifting and
> carrying would only be ten pounds occasionally and five
> pounds frequently. The claimant would be able to stand
> or walk for the duration somewhere between four to six
> hours out of an eight hour day, the claimant would be
> able to sit for the balance of that, perhaps the
> individual would need a self-directed sit/stand option
> in the process of performing such sedentary exertion.
> The individual would have minimal difficulties in
> pushing and pulling that would be accomplished
> bilaterally on a frequent[30] basis, Operation of foot
> controls, likewise, there would be some limitation
> due to lumbar radiculopathy, there would not be a
> capacity for constant and maybe not even frequent,
> less than frequent, and thus, occasional approaching
> frequent, but not quite fully frequent. This individual
> by virtue of issues with low back pain and cervical
> pain with radiculopathy in the upper extremity and also
> into the lower extremities would be impaired from being
> able to climb ladders, scaffolds or ropes on any more
> than emergent basis.  The person should be able to
> ascend ladders or stairs at least occasionally. The
> individual would be able to engage in short distance
> balancing without the use of any handheld assistive
> device. Stooping, crouching, crawling and kneeling
> would be occasional at best in terms of capacity. From
> a manipulative level, the individual does use for his
> dominant right hand a brace on the wrist and the fore
> thumb of his right hand; this is for support from the
> residual of the carpal tunnel surgery.  The individual

---

30. Under the Social Security regulations "frequent" is defined as
up to 2/3 of an 8-hour workday or approximately 5.33 hours.
"Occassionally" is defined as up to 1/3 of an 8-hour workday or
2.67 hours.

in terms of handling, fingering, feeling and grasping
activities on a gross and even fine motor level would
have some diminution in the use of the right hand from
activities at the constant level to perhaps at best
frequent from the right hand. However, on the
nondominant left hand it would be at least frequent if
not on a constant basis.  From a reaching and overhead
reaching standpoint the individual would have the
capacity to reach with both the left and right hand
laterally at least on an occasional basis approaching
frequent. Overhead reaching perhaps would be restricted
to occasional at best. This is an individual who by
virtue of lumbar radiculopathy should not be engaged
in any sort of prolonged ambulation over uneven
terrain. The individual has the appropriate capacity
with respect to oral communication and perhaps some
written based on education at the GED level.  He
wears glasses for corrective vision but beyond that
there is no indication of deficits with the visual
capacity.

Tr. 20-21.

Based on the above residual functional capacity and the
testimony of a vocational expert the administrative law judge
found that Vassell could perform work as a desk guard, a
surveillance system monitor, and a visual inspector, and that
there were a significant number of such jobs in the regional and
state economies. Tr. 25.

The administrative record in this case is 400 pages in
length, primarily consisting of medical and vocational records.
Vassell first argues that the administrative law judge erred when
he found that Vassell's impairments do not meet or equal a listed
impairment. Specifically, Vassell contends that the ALJ did not
give a sufficient explanation for so finding, Second, Vassell
argues that the ALJ did not appropriately consider the treating
physician's assessment of Vassell's functional abilities.

27

Finally, Vassell argues that the ALJ erred in judging the credibility of Vassell's claims of disabling pain.  Because we find substantial merit in the first and third arguments, we will not address in detail the second.[31]

With respect to the ALJ's step three determination, the ALJ erroneously stated that there was no evidence of nerve root compression.  The record reveals that Vassell suffered from "left lateral disc herniation at L4-5 with Left L4 dorsal root ganglion impingement." Tr. 391.  There is also evidence of neuro-anatomic distribution of pain for both the cervical and the lumbar discs. Tr. 310-311, 379-385 and 394. There is repeated evidence of limitation of motion of the spine. Tr. 198-199, 203 and 379-380. There is evidence of motor loss with muscle weakness. Tr. 212-215. There is evidence of sensory and reflex loss. Tr. 300-301 and 310-311. There are positive straight-leg raising tests. Tr. 218. Although the evidence is not always consistent, the ALJ made a blanket statement that there was no such evidence supporting a finding that Vassell's condition met Listing 1.04A relating to

_____

31. We will note that the only medical opinion supportive of the ALJ's decision and completely contrary to Dr. Chhabria's numerous statements that Vassell was totally disabled is the opinion of Dr. Tedesco who only performed a review of Vassell's medical records. Under the circumstances of this case and in light of Dr. Muthiah's opinion that Vassell was limited to less than full-time employment, we are not satisfied that Dr. Tedesco's opinion is substantial evidence supporting the ALJ's decision even in light of Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

disorders of the spine.[32]  If there were some reason to reject
the reports in the record of nerve root compression, weakness,
sensory and motor reflex loss, and positive straight-leg raising
testing, it was incumbent upon the ALJ to set forth that reason.
The ALJ's step three analysis is inadequate.

      The administrative law judge in his decision when
judging the credibility of Vassell's claims of disabling pain
stated as follows:

> In this case, the claimant's case in establishing
> disability is directly dependent on the element of pain
> which is of an intractable nature.  Pain is subjective
> and difficult to evaluate, both quantitatively and
> qualitatively. Nevertheless, most organic diseases
> produce manifestations other than pain and it is
> possible to evaluate the underlying processes and
> degree of resultant impairment by considering all of
> the symptoms.  Generally, when an individual has
> suffered pain over an extended period, there will be
> observable signs such as a significant loss of weight,
> **an altered gait** or **limitation of motion**, local morbid
> changes, or poor coloring of station.  In the present
> case, the claimant has complained of pain over an
> extended period of time.  **None of the above signs of
> chronic pain are evident.** While not conclusory by
> itself, this factor contributes to the determination

---

32. Listing 1.04A states in relevant part as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleous
> pulposus . . ., degenerative disc disease, . . .),
> resulting in compromise of a nerve root . . . or
> spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of
> motion of the spine, motor lose (atrophy with
> associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg
> raising test (sitting and supine) . . . .

that the claimant is not disabled as a result of pain.

Tr. 24 (emphasis added).  Our review of the record reveals that
on several occasions Vassell had medical appointments where he
exhibited an altered gait and limitation of motion. The
administrative law judge's assertion that Vassell did not exhibit
an altered gait or limitation of motion was clearly erroneous.

In addition to the above errors, the administrative law
judge erred at step two of the sequential evaluation process. The
Social Security regulations contemplate the administrative law
judge considering whether there are any medically determinable
impairments and then when setting a claimant's residual
functional capacity considering the symptoms of both medically
determinable severe and non-severe impairments.  20 C.F.R. §
404.1529.  The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c).  If a claimant has no
impairment or combination of impairments which significantly
limit the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant has any
severe impairments, the evaluation process continues.  20 C.F.R.
§ 404.1520(d)-(g).  A failure to find a medical condition severe
at step two will not render a decision defective if some other
medical condition was found severe at step two.  However, all of

30

the medically determinable impairments both severe and non-severe
must be considered at step four when setting the residual
functional capacity.  The social security regulations mandate
such consideration and this court has repeatedly so indicated.
See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at
12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No.
10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik,
J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35
(M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 404.1523,
404.1545(a)(2), 416.923 and 416.945(a)(2).

The record reveals that Vassell suffered from scoliosis
and degenerative disc disease of the thoracic spine.[33]   The
failure of the administrative law judge to find those conditions
as medically determinable impairments, or to give an adequate
explanation for discounting them, makes his decisions at steps
two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation
process draws into question the administrative law judge's
residual functional capacity determination and assessment of the
credibility of Vassell.  The administrative law judge found that
Vassell's medically determinable impairments could reasonably

33. The record reveals that Vassell suffered from multiple
herniated discs.  It is not clear that the administrative law
judge found that they were medically determinable impairments.
Degenerative disc disease is not really a disease but part of the
normal aging process. Herniated discs generally are considered a
step beyond the normal aging process.

cause Vassell's alleged symptoms but that Vassell's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. Tr. 22. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Vassell's medically determinable impairments.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: November  29, 2012